UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOYCE BISCHOFF, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:19-CV-04094 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| THORNTON TOWNSHIP, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Joyce Bischoff worked as a clerk for the Senior Services division of Thornton Township. She was fired in 2017, and then filed this lawsuit against Thornton for age and race discrimination, as well as retaliation, in violation of the Age Discrimination in Employment Act and Title VII of the Civil Rights Act. 29 U.S.C. § 621 *et seq.*; 42 U.S.C. § 2000e *et seq.* R. 1, Compl.[1] Thornton now moves for summary judgment on all claims. R. 46, Def. Mot. and R. 48, Def. Brief. For the reasons discussed in this Opinion, the motion is granted in its entirety.

## I. Background

In deciding Thornton's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Here, that is Joyce Bischoff.

---

[1]This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331. Citations to the docket are indicated by "R." followed by the docket entry.

Joyce Bischoff, a self-identifying Caucasian woman, worked as a clerk in the Thornton Township Senior Services department from around August 2015 until her firing in June 2017. R. 47, Def. Statement of Material Facts (DSOF) ¶ 1; R. 47-1, Bischoff Dep. 4:18–5:4, 5:20–6:7, 83:1–23; R. 47-1 at 213,[2] Bischoff Dep. Exh. 38,Termination Letter.[3] She was 70 years old when she was fired. DSOF ¶ 1.

The parties highlight a few key events underlying this case. On January 13, 2016, Bischoff was on the job, helping to serve food to senior citizens at a Thornton-sponsored dinner. Bischoff Dep. 14:10–20, 19:14–18; R. 47-3, Brown Dep. 14:1–12. Assistant Manager of Senior Services Marcia Brown, a Black woman who was around 54 years old at the time, was also working at the dinner. Brown Dep. 5:18–6:1, 14:1–12; R. 47-4, Tracy Decl. ¶ 6. Bischoff and Brown had a confrontation—but the parties diverge on what really happened. According to Bischoff, she had just delivered a tray of cake to a Thornton trustee to serve to attendees when Brown grabbed Bischoff by one arm, and then both arms, to berate her for passing out the cake. Bischoff Dep. 15:21–23, 17:1–18:8. Bischoff says that she tried to explain that she was simply following instructions and asked Brown to let her go—but Brown did not let go, and

---

[2]Thornton filed this letter, along with many other relevant records, as exhibits to the depositions of Joyce Bischoff and two Thornton employees. Each deposition was filed as one docket entry together with its exhibits. In this opinion, citations to exhibits specify to which deposition the exhibit belongs, and the page number within the docket entry where the cited portion of the exhibit can be found.

[3]The record is not clear on Bischoff's start date. Marcia Brown says Bischoff was already a Thornton employee when she (Brown) was hired in September 2014. Brown Dep. 8:19–9:11. Bischoff's signature appears on a page acknowledging Thornton policies dated February 2015. R. 47-1 at 53, Bischoff Dep. Exh. 2, Policy Manual Signature. Her exact start date, however, is not relevant to the facts of this case. The parties agree on her employment status and supervisors on the relevant dates.

2

Bischoff became afraid. *Id.* at 22:4–23:10. Later, Bischoff says, Brown asked her to "take this outside." *Id.* at 18:21–19:1. For her part, Brown denies touching Bischoff beyond possibly tapping Bischoff's shoulder to get her attention. Brown Dep. 19:3–20:9. Brown also denies asking Bischoff to "take this outside." *Id.* at 20:23–21:2. In Brown's account, she simply asked Bischoff not to serve cake yet and explained several times that they were going to delay serving the cake, even if a supervisor had asked for a tray. *Id.* at 16:1–18, 16:23–17:3, 17:8–16.

The day after the senior dinner, Bischoff filed a complaint with Sandra Tracy, Thornton's Human Resources Manager, about the incident with Brown. DSOF ¶ 12; Bischoff Dep. 12:22–13:12, 24:10–16, 26:11–27:5; R. 47-1 at 55, Bischoff Dep. Exh. 9, Bischoff Written Complaint; Tracy Dep. 9:18–10:3. Tracy is a Black woman who was around 64 years old at the time. Tracy Decl. ¶ 2. Bischoff also gave a copy of her complaint to the assistant to Thornton Township Supervisor Frank Zuccarelli (he is white and he too was around 64 years old at the time). Bischoff Dep. 12:22–13:12; Tracy Decl. ¶ 3. Bischoff's written account of the incident does not mention any concern that she was mistreated because of her age or race. Bischoff Written Complaint. In her deposition, Bischoff said that she had ample time to write her account and felt it was accurate. Bischoff Dep. 26:11–27:5. Tracy met with Bischoff and Brown separately to hear their accounts of the incident, then interviewed several witnesses. DSOF ¶ 14; Tracy Dep. 10:4–9; R. 47-2 at 33, Tracy Dep. Exh. 11, Letter from Tracy to Zuccarelli. No witnesses or video were able to confirm either Bischoff's or Brown's version of events. DSOF ¶ 17; Tracy Dep. 13:6–14:12.

3

A few weeks after the incident, in February 2016, Tracy met with Bischoff and Brown together. DSOF ¶ 16; Bischoff Dep. 29:1–15, 31:22–33:18; R. 47-1 at 59, Bischoff Dep. Exh. 12, Response Memorandum from Human Resources; Brown Dep. 24:18–20. Tracy instructed Brown never to touch Bischoff again, and told Bischoff to immediately report any physical contact to human resources. Bischoff Dep. 34:2–21; Response Mem. from H.R.. Tracy also instructed Bischoff to follow directives given by Brown, because Brown was her managing supervisor. Bischoff Dep. 35:21–37:2; Response Mem. from H.R. Bischoff agrees that Brown never touched her again. Bischoff Dep. 34:10–14. Bischoff wanted to meet with Township Supervisor Zuccarelli to discuss her concerns, but was not able to meet with him until June. Bischoff Dep. 24:15–16, 53:8–54:18.

Around three months after the January 2016 confrontation, Bischoff received two disciplinary warnings from Brown. On April 11, 2016, Brown gave Bischoff an oral warning for failing to report an unscheduled absence on April 5. Bischoff Dep. 37:12–22; R. 47-1 at 50, Bischoff Dep.Exh. 13, Oral Warning Notice; Brown Dep. 26:18–27:16. Bischoff insists that she did report the absence by calling her immediate supervisor, Paula Laven, who said she would tell Brown. Bischoff Dep. 38:20–39:10; Brown Dep. 30:3–19; Tracy Decl. ¶ 5. Soon after, on April 21, Brown issued Bischoff a written warning for "insubordination," alleging that Bischoff ignored a request to meet with Brown on April 13. R. 47-1 at 62, Bischoff Dep. Exh. 16, Written Warning, April 21, 2016. Bischoff says she did not hear Brown's request. Bischoff Dep. 40:6–

42:4, 44:1–11; Brown Dep. 28:7–17; R. 47-1 at 61, Bischoff Dep. Exh. 14, Email from Brown to Tracy April 13, 2016; Written Warning, April 21, 2016..

A few months later, in June 2016, Bischoff met with Township Supervisor Zuccarelli and relayed her concerns that Brown was retaliating against her for the January incident. Bischoff Dep. 53:8–54:10. Zuccarelli told Bischoff that he would talk to Brown, and Bischoff did not receive any further discipline or warnings from Brown. Bischoff Dep. 54:4–10, 56:8–17, 59:1–4.

As relevant to this case, the real trouble arose from an unrelated event in April 2016. On April 26, 2016, a Thornton resident and senior citizen named Louise Slater called Brown to complain about Bischoff: Slater said that Bischoff was discussing with Slater the workplace problems that Bischoff had. Brown Dep. 36:8–37:21; R. 47-2 at 39, Tracy Dep. Exh. 18, Email from Tracy to Manning April 26, 2016. Brown reported this phone call to HR Director Tracy and Special Projects Director Jill Manning. Brown Dep. 37:22–38:22; Bischoff Dep. 83:6–7; Tracy Decl. ¶ 4. Tracy emailed Bischoff to remind her that discussions with Thornton about Bischoff's employment and discipline were confidential. Bischoff Dep. 48:10–19; R. 47-1 at 63, Bischoff Dep. Exh. 19, Email from Tracy to Bischoff April 26, 2016. That was not the end of the matter: Brown, Tracy, and another Township employee fielded more phone calls from Slater complaining about Bischoff's behavior and asking the Township to make it stop. Brown Dep. 40:21–44:10; Tracy Dep. 15:7–24, 16:3–22. Tracy reported the complaints to Supervisor Zuccarrelli, who said that type of behavior could not be tolerated and that it was necessary to convene a meeting with Bischoff and her manager. Tracy

5

Dep. 18:1–10. In September 2016, the meeting was held, with Tracy, Jill Manning, Zuccarrelli, Bischoff, and Bischoff's supervisor Paula Laven attending it. Tracy Dep. 19:4–8. During this meeting, the Township supervisors confronted Bischoff with Slater's complaints, which included that Bischoff had called repeatedly to talk about township business; used the n-word to refer to African-American Thornton employees; complained about Zuccarrelli; and left a voicemail message calling Township employees "heartless m...f'ers" (the message was played for Bischoff during the meeting). Tracy Dep. 19:10–20:24; Bischoff Dep. 49:16–52:14, 59:5–21; Tracy Dep. 22:5–14, 23:4–22, 26:16–27. During this meeting, Bischoff's supervisors told her not to contact or call Slater again for any reason. Bischoff Dep. 61:4–21; Tracy Dep. 52:5–9.

Three days after the meeting, on September 26, Slater called Tracy to complain that Bischoff had called Slater yet again after the meeting and threatened to bomb Slater's house. Tracy Dep. 24:6–25:9, 52:10–15, 54:23–55:22. Slater filed a police report, which Tracy later received. Tracy Dep. 28:8–29:3. Slater also went to state court and filed for an order of protection from Bischoff. Bischoff Dep. 68:23–69:19; R. 47-1 at 198, Bischoff Dep. Exh. 26, Petition for Stalking No Contact Order; R. 47-1 at 201, Bischoff Dep. Exh.27, Emergency Stalking No Contact Order; Tracy Dep. 29:4–9. Bischoff says that she first heard about this filing from Jill Manning. Bischoff Dep. 69:12–19.

Aside from Slater, another senior citizen complained about Bischoff. On October 18, 2016, Bischoff was working at another senior meal event when a senior attendee complained about her. Bischoff Dep. 72:22–73:3. Bischoff says that the senior

was unhappy because she could not get a meal early, and then came too late when the food had run out. *Id*. 73:2–73:11.

A couple of days after that complaint, on October 20, Bischoff met with Laven (Bischoff's immediate supervisor) and Special Projects Director Manning. The supervisors gave Bischoff a letter stating that she was suspended with pay because of the Slater incidents and the October 18 complaint. Bischoff Dep. 71:24–72:16; R. 47-1 at 204, Bischoff Dep. Exh. 29, Suspension Letter, October 20, 2016. According to Bischoff, Manning told her that if she won the restraining order case filed by Slater, then Bischoff could return to work. Bischoff Dep. 79:15–80:12. (Thornton denies this. R. 62, Def. Resp to PSOF ¶ 7–8 (citing Tracy Dep. 27:7–27:16, 40:6–20, 41:8–17, 43:11–44:13.[4])

Several days later, on October 15, Bischoff attended the hearing on Slater's petition for a protective order. The state court denied Slater's petition. Bischoff Dep. 70:14–17, 76:1–2, 79:19–22. Bischoff was surprised that nobody from Thornton attended the hearing. Bischoff Dep. 79:23–80:8. According to Bischoff, Slater was unable to produce evidence of harassment; the judge scolded Slater for illegally recording calls with Bischoff; and Slater threatened Bischoff in the courtroom. Bischoff Dep.

---

[4]The cited portions of Tracy's deposition do not explicitly refute Bischoff's assertion that Manning told her she could return to work if Slater did not obtain a protective order. Instead, Tracy testified about a meeting in which Tracy, Manning, and Zuccarrelli agreed that Bischoff's behavior was not acceptable. Tracy Dep. 27:7–16. She also testified that she, Manning, and Zuccarelli decided the Township would take a neutral position on the protective-order proceedings. *Id*. 30:11–19. Tracy also testified that she did not discuss the court case with Manning, *id*. 41:5–7, and that when she and Manning discussed Bischoff's situation, they agreed that she should be terminated for failing to produce requested phone records. *Id*. 40:10–20. There is no deposition or declaration from Manning herself in the record.

79:19–22, 97:21–22. Bischoff says Tracy knew that the court denied Slater the protective order. R. 60, Pl. Statement of Material Facts (PSOF) ¶ 5 (citing R. 47-2 at 48, Tracy Dep. Exh. 32, Due Process Hearing Record; R. 47-2 at 54, Tracy Dep. Exh. 36, Tracy Mem. February 10, 2017). Bischoff cites a memorandum dated February 10, 2017, from Sandra Tracy to Bischoff's file, which includes this statement: "Also Bischoff indicates that since the court hearing did not find her at fault, she is allowed to return to work." Tracy Mem., ¶ 7. Thornton denies that the exhibits show that it knew Bischoff had won the hearing. Def. Resp. to PSOF ¶ 5 (citing Tracy Dep. 30:20–31:9, 40:21–41:7). Viewing the evidence in the light most favorable to Bischoff, however, the Court accepts for summary judgment purposes that Thornton did know about the outcome of the hearing.

Around two weeks later, on November 1, 2016, Tracy sent Bischoff a letter announcing that Tracy recommended the termination of Bischoff's employment due to Bischoff's continued contact with Slater after explicitly being told to leave Slater alone. Bischoff Dep. 74:21–75:12; R. 47-1 at 205, Bischoff Dep. Exh. 31, Termination Recommendation Letter. The letter included notice of a due process hearing that would take place on November 9. *Id.* On that date, Bischoff attended the hearing. Bischoff Dep. 75:13–76:5. At the hearing, Bischoff gave her version of events, explaining that she and Slater were friends outside of work and that Slater had often asked her for favors and meals. *Id.*; Due Process Hearing Record. Bischoff further explained that Slater was seriously ill and had mistreated her and harassed her children by telephone. *Id.* at 48–49. Bischoff said that Slater called her on September 24 "with

8

threats," *id.* at 49, but Bischoff apparently did not (at the due process hearing) admit that Bischoff had called Slater that day. Eventually, in her deposition, Bischoff admitted that, after being forbidden from doing so, she did in fact call Slater on September 24 at 9:41 p.m., in order to return Slater's call. Bischoff Dep. 65:3–67:18. That call to Slater is recorded in the T-Mobile records that were eventually obtained during this litigation. R. 47-1 at 189, Bischoff Dep. Exh. 23, T-Mobile Phone Records. At the time of Bischoff's suspension and termination, however, Thornton did not have the phone records. Bischoff Dep. 81:6–10; R. 47-1 at 211, Bischoff Dep. Exh. 37, Letter Regarding Phone Records Not Received.

Two weeks after the hearing, on November 23, Tracy sent Bischoff a written request to produce cell phone records from April 1 through November 1, 2016, to figure out once and for all what contact Bischoff had had with Slater. Bischoff Dep. 76:6–77:5; R. 47-1 at 209, Bischoff Dep. Exh. 33, Letter Requesting Phone Records; Tracy Dep. 52:16–19. Tracy told Bischoff, and Bischoff understood, that if Bischoff did not produce the records by November 28, Bischoff would be suspended without pay. Bischoff Dep. 77:6–11; Letter Requesting Phone Records. But Bischoff did not provide the records. Bischoff Dep. 98:3–8; Tracy Dep. 52:24–53:4. One day after the deadline, on November 29, Manning sent Bischoff another letter, informing Bischoff that she was now suspended without pay and giving Bischoff another chance to provide the requested records by December 9—or else face termination. Bischoff Dep. 78:11–79:6; R. 47-1 at 210, Bischoff Dep. Exh. 35, Letter from H.R. Suspending Bischoff Without Pay. Bischoff still did not produce the records. Bischoff Dep. 98:3–8; Tracy Dep. 53:2–

13. Months later, on May 17, 2017, Bischoff received a letter from Manning declaring that because Bischoff refused to turn over the records, the Thornton Board of Trustees would consider firing her at its May 23, 2017 meeting. Bischoff Dep. 81:6–10; Letter Regarding Phone Records Not Received. Ultimately, Bischoff's employment termination was considered and approved at the Trustees' meeting during the next month (specifically, on June 20, 2017). Bischoff Dep. 81:16–18; Termination Letter.

On April 13, 2018 (the date is important because Thornton raises an issue of timeliness), Bischoff filed a complaint of age and race discrimination, as well as retaliation, with the Equal Employment Opportunity Commission. R. 1-1, Pl. Exh. 1. After receiving a right-to-sue letter, she filed this lawsuit. *Id.* Thornton now seeks summary judgment against all of the claims. R. 46, Def. Mot., R. 48, Def. Brief.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be

admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Timeliness

In its summary judgment motion, Thornton first argues that the entire case must be dismissed because Bischoff did not file her EEOC charge within 300 days of losing her job. R. 48, Def. Br. at 7. That is just wrong. Bischoff was fired on June 20, 2017, and she filed her EEO charge on April 13, 2018—297 days later. All that Thornton says in reply is that Bischoff knew as of November 29, 2016, that a failure to produce the phone records would result in her firing. R. 63 at 1. But Thornton does not explain why the demand for records has any effect on the limitations period. Nor does Thornton cite any case on this issue in the reply. *Id.* The challenge to the firing is timely.[5]

---

[5]Thornton possibly could have raised a more nuanced argument on timeliness. Arguably, because Bischoff's suspension without pay happened in November 2017, which was well before the 300-day limitations period, there could have been some limit on Bischoff's damages—had the case proceeded to the damages stage.

11

### B. Age and Race Discrimination

Bischoff claims that Thornton fired her based on her age and race, in violation of the Age Discrimination in Employment Act (ADEA) and Title VII. She is Caucasian and was 70 years old when she was fired in June 2017. Bischoff Dep. 83:1, 83:23; Termination Letter. Generally speaking, the same overall analysis applies to claims under Title VII and the ADEA. *See David v. Board of Trustees of Community College District No. 508*, 846 F.3d 216, 225 (7th Cir. 2017); *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). A plaintiff seeking to recover for disparate treatment under these statutes must show that their age or race caused the challenged adverse employment action. *Carson v. Lake County., Indiana*, 865 F. 3d 526, 532 (7th Cir. 2017).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court established the now-familiar framework for evaluating disparate-treatment claims. To invoke *McDonnell Douglas* as a way of surviving summary judgment, Bischoff first must establish a *prima facie* case that Thornton discriminated against her based on her age or race. 411 U.S. at 802. If she can do that, then the burden shifts to Thornton to offer a legitimate, nondiscriminatory reason for its decision. *Id.*; *see also Carson*, 865 F.3d at 533. If Thornton manages to meet that burden, then Bischoff must show that the employer's offered reason is actually a pretext to cover up a true discriminatory motive. *McDonnell Douglas*, 411 U.S. at 804.

It is of course possible to survive summary judgment in employment discrimination cases without relying on *McDonnell Douglas*. Indeed, the Seventh Circuit has

cautioned against adhering too strictly to any particular test or analysis, lest the courts screen out valid claims of discrimination based on circumstantial evidence that does not fit neatly within a certain framework. *Ortiz,* 834 F.3d at 765. As explained next, however, Bischoff has failed to set forth a *prima facie* case and has equally failed to offer enough circumstantial evidence of discrimination, even when the evidence is viewed in her favor.

### 1. *Prima Facie* Case

To establish a *prima facie* case, Bischoff must show that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Carson*, 865 F.3d at 533 (cleaned up).[6] Because she is white, the Seventh Circuit also requires Bischoff to show, for her race discrimination claim, that some "background circumstances" exist at her workplace to show "it is the unusual employer who discriminates against majority employees." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 456–57 (7th Cir. 1999).

There is no dispute that Bischoff is old enough to be protected by the ADEA. There is also no dispute that she suffered an adverse employment action: she was fired. The two *prima facie* elements in dispute are whether she was meeting Thornton's "legitimate expectations" and whether comparators in her workplace

---

[6]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

(outside her age and race group) were treated better than she was. (It turns out that there is no need to look for background circumstances of reverse race discrimination, because the claims do not survive even the usual analysis for discrimination claims.)

### a. Legitimate Expectations

If a plaintiff cannot establish (when the evidence is viewed in her favor) that she is performing to her employer's legitimate expectations, then "the inference that [the employee] would not have been fired had [she] not been a member of a protected group is very weak" and the *prima facie* case is undermined. *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). Although the expectations must be "legitimate," that simply means actual, "bona fide expectations"; employers may set job expectations—even demanding ones—so long as the employer does not discriminate. *Id.* The requirement is sometimes described as performing "her *job* according to her employer's legitimate expectations," further emphasizing that, of course, the employer's expectations must be job-related. *Rozumalski v. W.F. Baird & Assocs.*, 937 F.3d 919, 926 (7th Cir. 2019) (emphasis added). Having said that, the Seventh Circuit has been clear that completing assigned tasks is not necessarily enough to fulfill expectations if the employee also has an insubordinate attitude (so long as the employer evenhandedly disciplines employees for insubordination). *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007). Typically, a long pattern of misbehavior and warnings is enough to show failure to meet expectations, even if the employee also received some favorable job evaluations. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002) (holding that 18 months' worth of poor-performance warnings showed that

the employee was not meeting expectations); *Kapoor v. Indiana Univ. Bd. of Trustees*, 2008 WL 11375440, at *5 (S.D. Ind. Aug. 25, 2008) (explaining that some favorable evaluations did not outweigh numerous complaints about inappropriate behavior from at least 20 colleagues and patients).

Viewing the evidence in the light most favorable to Bischoff, a reasonable jury could find that she was *in fact* performing up to the overall expectations of her job (as explained later, this is subtly different from whether Thornton offered a nondiscriminatory reason for firing her—it did). Thornton points exclusively to her contacts with Slater, and her refusal to provide phone records, as the basis for the termination. DSOF ¶ 57, Tracy Dep. 39:22–40:17, 41:8–42:22, 43:11–44:13, 54:5–10; R. 47-1, at 205, Termination Recommendation Letter; Letter Regarding Phone Records Not Received. In response, Bischoff offers evidence that that she and Slater were friends outside of Bischoff's work setting, and that Slater had often asked her for favors and meals. Bischoff Dep. 75:13–76:5; Due Process Hearing Record. On top of that, the state court denied Slater's petition against Bischoff. Bischoff Dep. 70:14–17, 76:1–2, 79:19–22. According to Bischoff (whose version of events must be accepted as true right now), Slater was unable to produce evidence of harassment. Bischoff Dep. 79:19–22, 97:21–22. If that evidence is credited—which the Court must at the summary judgment stage—then she was in fact adequately performing her job duties.

### b. Similarly Situated Employees

To complete her *prima facie* case, Bischoff must show (again, viewing the evidence in her favor) that "similarly situated employees who were not members of her

15

protected class were treated more favorably." *Carson*, 865 F.3d at 533. "Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (cleaned up). Bischoff has the burden to identify a younger or non-white employee who received more favorable treatment than she did. *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1311 (7th Cir. 1997). She has failed to do that. In Bischoff's deposition, she offered vague testimony, based on hearsay and conjecture, that other Thornton employees—age and race not identified—had committed theft and not faced discipline. Bischoff Dep. 84:12–89:8. Because this proffered evidence would not be admissible at trial, it cannot be considered in evaluating her prima facie case. Fed. R. Civ. P. 56(c)(2); *Cairel v. Alderden,* 821 F.3d 823, 830 (7th Cir. 2016) ("If the evidence is inadmissible hearsay, the courts may not consider it"). Just offering Bischoff's speculation about the other employees—about which she had no personal knowledge—does not move the evidentiary needle. Bischoff might have been on to something if, during discovery, she had gathered personnel files with business records to support her assertions; or if she offered affidavits from someone with personal knowledge; or if Bischoff's testimony was based on party admissions from Thornton's supervisors or human resources personnel. Nothing like that is offered. Bischoff had the duty to "affirmatively demonstrate, by producing evidence that is more than merely colorable, that there is a genuine issue for trial." *Omnicare, Inc.*, 629 F.3d at 705 (cleaned up). She has not done so.

Meanwhile, Thornton *did* present evidence that younger employees and Black employees *were* fired for disciplinary infractions comparable to what Thornton believed Bischoff had committed. DSOF ¶ 56; Tracy Dep. 33:8–39:20. Bischoff has neither contradicted these accounts nor attempted to distinguish them from her situation. R. 59, Pl. Response to DSOF ¶ 56. So Bischoff's *prima facie* case of discrimination falters on this element, and the claims of discrimination cannot rely on *McDonnell Douglas* to survive summary judgment.

## 2. Non-discriminatory Reason

For completeness' sake, it is worth noting that even if Bischoff had established a *prima facie* case, Thornton would still be entitled to summary judgment. After a plaintiff establishes her *prima facie* case, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *David*, 846 F.3d at 225. Thornton has articulated a legitimate, nondiscriminatory reason: Bischoff was fired because Louise Slater complained that she was being harassed by Bischoff, Bischoff's supervisors told her not to call Slater, and when they asked Bischoff to produce cell phone records to confirm whether she had called Slater anyway, Bischoff refused to turn over any records. DSOF ¶ 57; Tracy Dep. 39:22–40:17, 41:8–42:22, 43:11–44:13, 54:5–10; Letter Regarding Termination Recommendation; Letter Regarding Phone Records Not Received. Nothing about this set of reasons is discriminatory based on age or race.

Thornton also has presented a mountain of testimony and evidence supporting its contention that Bischoff's supervisors honestly believed that Bischoff had contradicted their orders to not call Slater and honestly believed that Bischoff was acting insubordinately by refusing to provide her phone records. Indeed, the phone records that Bischoff refused to produce would only have confirmed that Bischoff had in fact called Slater contrary to Thornton's orders. T-Mobile Phone Records.

Bischoff objects that Thornton cannot rely on Slater's statements because they are inadmissible hearsay. Pl. Resp. at 7. But Thornton does not offer Slater's statements to show their *truth*—instead, Thornton only offers Slater's complaints as evidence of why the supervisors believed that Bischoff had mistreated Slater and why the supervisors directed Bischoff to provide phone records. R. 63, Def.'s Supp. Reply at 2. Slater's statements are indisputably admissible for that purpose, as many employment discrimination cases hold. *See, e.g.*, *Simpson v. Beaver Dam Community Hospitals, Inc.*, 780 F.3d 784, 796 (7th Cir. 2015) (holding that a court could consider a negative job reference "to show its effect on the state of mind of the hearer"); *Boutros v. Avis Rent A Car Sys., LLC*, 802 F.3d 918, 925 (7th Cir. 2015) (permitting hearsay statements when offered to show employer's non-discriminatory motive for adverse employment action); *see also United States v. Leonard-Allen*, 739 F.3d 948, 954 (7th Cir. 2013) (explaining that a "witness's statement is not hearsay if the witness is reporting what he heard someone else tell him for the purpose of explaining what the *witness* was thinking, at the time or what motivated him to do something"). With that

evidence in place, Thornton has adequately offered a legitimate, nondiscriminatory reason for firing Bischoff.

### 3. Pretext

If Bischoff had established a *prima facie* case, and if the analysis had moved beyond Thornton's legitimate, nondiscriminatory reason, then the burden would have shifted back to Bischoff. *David*, 846 F.3d at 225. Specifically, Bischoff would have been required to offer enough evidence (viewed in her favor) for a reasonable jury to find that Thornton's proffered reason was in reality a pretext for discrimination. *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005 (7th Cir. 2001). To show pretext, an employee "must demonstrate that [the] proffered reason is a lie or completely lacks a factual basis"—she cannot merely argue that the presented reasons were "mistaken, ill considered, or foolish." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000) (cleaned up). Nor can an employee show pretext by showing that the stated reason was merely unfair. *Zayas v. Rockford Memorial Hosp.*, 740 F.3d 1154, 1158–59 (7th Cir. 2014). In other words, it is Bischoff's burden to show that Thornton's proffered explanation is "a dishonest explanation, a lie rather than an oddity or an error." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (cleaned up).

What little effort Bischoff makes to show pretext is unsuccessful. In her deposition, Bischoff admits that she understood that if she did not produce her phone records, then she would be fired. Bischoff Dep. 99:2–9. She argues that the only possible reason Thornton could have for requesting her phone records is "to harass and torment Bischoff, or/and to concoct a phony 'basis' for termination of Bischoff's

19

employment." Pl. Resp. at 9. Thornton's stated reason must be pretext, she reasons, because she prevailed at Slater's restraining order hearing, resolving the issue of any supposed harassment. *Id.* at 8–9.

But just because Bischoff fended off the restraining order does not mean that Thornton's concerns simply evaporated. First, an employer may still have concerns about an employee's conduct even if a state court does not issue a restraining order against that employee. Second, an employer may change its mind without the change in course forming a pretext for discrimination. Bischoff accuses Thornton of "reneging" on Manning's promise that she could return to work. Pl. Resp. at 3. That change in course was arguably unfair, but that does not make it a pretext for age or race discrimination. Moreover, there is nothing pretextual about demanding phone records to confirm whether an employee has complied with an instruction to stop contacting a complainant. Finally, to repeat, Thornton need show only that it was *genuinely* motivated by its concerns about Bischoff's contacts with Slater, not that those concerns would have prompted every employer to demand phone records and to punish a refusal to turn them over. *Jordan*, 205 F.3d at 343. This crucial distinction in employment discrimination cases makes it possible for both of the following to be true: that Bischoff in fact was performing up to expectations *and* that Thornton has established a legitimate, nondiscriminatory reason for firing Bischoff based on the events involving Slater.[7]

---

[7]It is worth noting that, in some factual settings, an employer's proffered reason is so arbitrary or harsh that its arbitrariness or harshness is *itself* a piece of evidence in support of pretext. But that is not the case here.

Bischoff argues that the context of her firing supports an inference of pretext. Pl. Resp. at 9–10. The context she offers, aside from the victory against the restraining-order petition, is Tracy's use of the phrase "paper trail." *Id.* at 9. Specifically, in an April 26, 2016 email from Tracy to Jill Manning, Tracy reported that she was going to write Bischoff to remind her not to discuss confidential work matters. Email from Tracy to Manning. Tracy ended the email with this pessimistic take: "I have no illusions that she will stop, but this will be another document in the paper trail." *Id.* Bischoff contends that this is a smoking gun, but the context says otherwise: first, this email was sent over one year before she was fired in June 2017. Second, it is perfectly natural for a human resources manager like Tracy to create a "paper trail" for employment decisions and employment directives to employees. If there were *no* written records of directives to employees, then Thornton would face criticism coming the other way: where are the records supporting that the directives were issued? No reasonable jury could infer discrimination from this email and its reference to building a "paper trail."

It is true, of course, that the surrounding circumstances of an employment action often do provide circumstantial evidence of pretext. Indeed, Bischoff cites two cases in which the Seventh Circuit examined context to conclude that there was sufficient evidence of pretext. It is worth describing those cases more closely to show how Bischoff's "paper trail" evidence falls far short of them. In *Loudermilk v. Best Pallet Company*, an African American employee was fired, supposedly for breaking a purported company rule against taking pictures in the workplace. *Loudermilk v. Best*

*Pallet Co., LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011). In the days leading up to the firing, Loudermilk had repeatedly complained of mistreatment in comparison to his Hispanic coworkers, and he also talked about filing an EEOC complaint. *Id.* at 314. The employee complained, among other things, that he was assigned to work alone at a station that needed two workers, and he took photographs of the station so that he would be able to illustrate this problem in his complaint. *Id.* When a supervisor told him to stop, Loudermilk explained his concerns about unfair treatment, and the supervisor told him to "put it in writing." *Id.* When Loudermilk handed the supervisor a written complaint the next day, Loudermilk was immediately fired. *Id.* The Seventh Circuit was concerned that this policy was itself effectively retaliatory, preventing employees from gathering evidence of discrimination: "a 'policy' that may have been devised to curtail an investigation is not the sort of neutral rule that would adequately explain a discharge." *Id.* at 315.

Loudermilk's case and Bischoff's are night and day. First and most importantly, Loudermilk complained he was being discriminated against because of his race before he was fired. *Loudermilk*, 636 F.3d at 314. Armed with this knowledge, the employer had every reason to retaliate and to thwart the complaint. Bischoff made no such complaints until long after her firing. Bischoff Written Complaint; EEOC Dismissal at 4–7. Second, Loudermilk was fired the very same day that he filed a written complaint, allegedly for breaking a rule that itself appeared retaliatory and prevented employees from gathering evidence. *Loudermilk*, 636 F.3d at 314. Bischoff's "paper trail" email was sent over one year before she was fired, and Thornton's

proffered reason to fire her (because supervisors believed that she mistreated a senior citizen and because Bischoff refused to produce phone records, DSOF ¶ 57; Tracy Dep. 39:22–40:17, 41:8–42:22, 43:11–44:13, 54:5–10; R. 47-1 at 205; Termination Recommendation Letter; Letter Regarding Phone Records Not Received), is neither suspicious nor discriminatory.

The second case cited by Bischoff, *Coleman v. Donahoe*, further illustrates that she has not presented the kind of context that could expose a pretextual motive, even when the evidence is viewed in her favor. In *Coleman*, the Postal Service asserted that it fired a postal worker because she "posed a threat to kill her supervisor." =667 F.3d at 852. The alleged threats had been made to a doctor, in a usually protected and confidential context, early in a course of in-hospital psychiatric treatment that Coleman herself had sought out. *Id.* at 855. Coleman did not return to work until her doctor discharged her from the hospital, having deemed her "stable." *Id.* at 856. And Coleman was immediately fired when her statements during therapy came to light, rather than allowed to engage in more evaluation. *Id.* at 856–57. The Seventh Circuit held that the context of the purported threat was so obviously unique (made during a therapy session), and her mental state on returning to work so obviously improved, and the firing so quick and extreme, that Coleman had offered enough evidence of pretext to defeat summary judgment. *Id.* at 857.

In contrast, Thornton was concerned because Louise Slater had reported that Bischoff was directly harassing Slater—not because supervisors had learned that Bischoff had privately expressed troubling thoughts to a therapist. DSOF ¶ 57; Tracy

23

Dep. 39:22–40:17, 41:8–42:22, 43:11–44:13, 54:5–10; R. 47-1 at 205; Termination Rec-ommendation Letter; Letter Regarding Phone Records Not Received. Also, Thornton did not leap to fire Bischoff immediately after Slater complained. Indeed, Slater's first complaints were made in late April 2016, and only after the restraining-order hearing in mid-October 2016 and Bischoff's denial that she disobeyed orders not to contact Slater did Thornton ask for the phone records (specifically, on November 23). Bischoff Dep. 76:6–77:5; Letter Requesting Phone Records; Tracy Dep. 52:16–19. Only after all that was Bischoff suspended without pay and eventually fired. Bischoff Dep. 77:6–11, 78:11–79:6, 81:6–10, 81:16–18; Letter Requesting Phone Records; Letter Regard-ing Suspension Without Pay; Letter Regarding Phone Records Not Received; Termi-nation Letter. Along the way, she was given multiple opportunities to produce the records and potentially avoid the termination. *Id.* All of this stands in sharp contrast to the Postal Service's speedy firing of the postal worker in *Coleman.* Nothing about the context of Bischoff's case supports an inference of discrimination.

### 4. Circumstantial Evidence

Moving beyond the *McDonnell Douglas* framework, the ultimate question is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. As just discussed, the overall context of the case and the circumstantial evidence, even when viewed in Bis-choff's favor, do not support a finding that Thornton engaged in age or race discrimi-nation against her. There is nothing the supervisors said or did suggesting that they

24

held any racial or age-based animosity towards her. Nor is Tracy's reference to a "paper trail" sufficient for a reasonable jury to premise a finding of discrimination. An overall look at Bischoff's evidence generates a genuine issue of material fact no more than the *prima facie* framework does.

### C. Retaliation

Lastly, Bischoff's claim for retaliation also fails for lack of evidence. An employer may not retaliate against an employee who complains about discrimination. 42 U.S.C. § 2000e–3(a); *Miller v. Am. Family Mutual Ins. Co.,* 203 F.3d 997, 1007 (7th Cir. 2000); *Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 657 (7th Cir. 2012). Following a variation of the *McDonnell Douglas* framework, Bischoff can establish a *prima facie* case of retaliation by showing: "(1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, the employer took an adverse action against her; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Rozumalski,*937 F.3d at 926. Bischoff fails to clear the first hurdle in this analysis: she has not alleged that she engaged in a statutorily protected activity.

Not every workplace complaint made to an employer is statutorily protected. The complaint must allege discrimination based on a protected characteristic. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (explaining that, although "filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination

occurred because of sex, race, national origin, or some other protected class"); *Emerson v. Dart*, 900 F.3d 469, 472 (7th Cir. 2018) (holding that, of two job grievances filed by the employee, only the one complaining of discrimination based on a protected characteristic could support a retaliation claim). In *Tomanovich v. City of Indianapolis*, the employee had filed a complaint alleging "discrimination," but had not specifically alleged the basis of the discrimination. *Tomanovich*, 457 F.3d at 663. The Seventh Circuit concluded that "complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient" to count as protected activity. *Id.*

Here, Bischoff did not even get as far as the employee in *Tomanovich*. Bischoff seems to base her retaliation claim on a complaint that she filed about Marcia Brown in January 2016. Compl. ¶ 80. But that complaint was devoid of *any* claims of discrimination, let alone a claim of discrimination based on age or race. Written Complaint. In her deposition, Bischoff testified at length about her confrontation with Brown at the senior dinner, but Bischoff did not testify that, at the time of the confrontation (or, indeed, at any time during her employment at Thornton), she complained that the confrontation was based on age or race discrimination. Bischoff Dep. 17:1–19:6. Bischoff's complaints about Brown did not take on an age or race dimension until Bischoff filed her claims with the EEOC in 2018, after she was fired. EEOC Dismissal.

Aside from failing to engage in statutorily protected activity, Bischoff also would fail to satisfy the *prima facie* requirement that she was treated less favorably

than similarly situated employees who did not engage in statutorily protected activity. As discussed earlier, she has presented no admissible evidence about similarly situated employees at all. Nor would a broader view of all the evidence, as dictated by *Ortiz,* save Bischoff's retaliation claim. There simply is no circumstantial evidence that would allow a reasonable jury to find that Thornton acted with a retaliatory motive.

### IV. Conclusion

Thornton's motion for summary judgment is granted against all of the claims and the case is dismissed with prejudice. The status hearing of April 12, 2021 is vacated, and final judgment will be entered on the docket separately.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 27, 2021